1  FLIESLER MEYER LLP
   Martin C. Fliesler (SBN 073768)
2  Rex Hwang (SBN 221079)
   Julie Daniels Missud (SBN 219508)
3  650 California Street, 14th Floor
   San Francisco, California  94108
4  Telephone:     (415) 362-3800
   Facsimile:     (415) 362-2928
5  mcf@fdml.com
   rhwang@fdml.com
6  jmissud@fdml.com

7  **Attorneys for Plaintiff,**
   **Hi/fn, Inc.**

8

9

10                    **UNITED STATES DISTRICT COURT**

11                  **NORTHERN DISTRICT OF CALIFORNIA**

12                     **SAN FRANCISCO DIVISION**

13  Hi/fn, Inc.,                                    | **CASE NO.  C 07-6430 MMC**
    a Delaware Corporation,
14
                Plaintiff,                          | **PLAINTIFF HIFN, INC.'S NOTICE**
15                                                  | **OF MOTION AND MOTION FOR**
                v.                                  | **SUMMARY JUDGMENT;**
16                                                  | **MEMORANDUM OF POINTS AND**
    JONATHAN W. DUDAS, Director of the              | **AUTHORITIES**
17  United States Patent & Trademark Office,
                                                    | **Date:      May 30, 2008**
18              Defendant                           | **Time:       9:00 a.m.**
                                                    | **Location:   Courtroom 7, 19th Floor**
19
                                                    | **Honorable Maxine M. Chesney**
20

21

22        PLEASE TAKE NOTICE that on Friday, May 30, 2008 at 9:00 a.m., in the Courtroom of

23  the Honorable Maxine M. Chesney, United States District Court Judge, Courtroom 7, 19th Floor,

24  United States District Court, 450 Golden Gate Avenue, San Francisco, California, Hi/fn, Inc.,

25  ("Hifn" or "Plaintiff"), Plaintiff in the above-styled action will move this Court for summary

1 | judgment, pursuant to Fed. R. Civ. P. 56, on the ground that there is no genuine issue as to any

2 | material fact and that the moving party is entitled to judgment as a matter of law for the reason

3 | that the United States Patent and Trademark Office's ("USPTO") decision to refuse

4 | reinstatement of nine of Plaintiff's patents constituted an arbitrary and capricious agency action

5 | by the USPTO.

6 |     The nine patents are as follows: U.S. Patent No. 5,003,307; U.S. Patent No. 5,414,425;

7 | U.S. Patent No. 5,016,009; U.S. Patent No. 5,126,739; U.S. Patent No. 5,146,221; U.S. Patent

8 | No. 5,532,694; U.S. Patent No. 5,414,850; U.S. Patent No. 5,506,580; and U.S. Patent No.

9 | 5,463,390.  The Parties have stipulated that U.S. Patent 5,003,307 (the "'307 Patent") shall be the

10 | representative patent for all nine patents for purposes of deciding all issues in this case.

11 | Accordingly, only the administrative record for the '307 Patent has been submitted to this Court,

12 | and the details surrounding the '307 Patent will be addressed in the memorandum of points and

13 | authorities submitted herewith.  The Order issued for this Motion should, however, apply to all

14 | nine patents listed above.  *See* Dkt. 5, Stipulation and Order.

15 |     The motion will be based on this motion and memorandum of points and authorities, any

16 | evidence offered in support of the motion, the administrative record in this case, the arguments

17 | of the parties, and such other matter as may be presented to or considered by the Court.

18 |                    Respectfully submitted,

19 |

20 | Dated:     April 25, 2008            /s/ Martin C. Fliesler
                               FLIESLER MEYER LLP

21 |                                Martin Fliesler (SBN 073768 )
                               Rex Hwang (SBN 221079)

22 |                                Julie Daniels Missud (SBN 219508)
                               650 California Street, 14th Floor
                               San Francisco, California 94108

23 |                                Attorneys for Plaintiff
                               Hi/fn, Inc.

24 |

25 |

# TABLE OF CONTENTS

I.     Introduction ..................................................................................................1

II.    Statement of Facts .........................................................................................2

       A. Brief Summary of the Factual Record ...................................................2

       B. Details of Factual Record ......................................................................3

              1. Issuance and Maintenance Fee History of the '307 Patent ...........3

              2. Facts Leading to the Expiration of the '307 Patent......................3

              3. Diligence Following Discovery of the Expiration of the '307 Patent ...........8

       C. Details of Procedural Record ................................................................8

              1. Hifn's Petition to Reinstate the '307 Patent denied by the USPTO .............8

              2. Hifn's Petition for Reconsideration Denied by the USPTO ........................9

III.   Argument ....................................................................................................10

       A. The USPTO Decision Must Be Set Aside if it is Arbitrary and Capricious ...........10

       B. Patent Law and Precedent Require the USPTO to Accept Late Payment
          of a Maintenance Fee Where the Delay in Payment was Unavoidable
          Because Reasonable Care Was Taken to Pay On Time...........................................10

       C. The USPTO's Finding That Hifn Did Not Take Reasonable Steps to
          Ensure Timely Payment of the '307 Patent Maintenance Fees is
          Arbitrary and Capricious................................................................................12

              1. The USPTO's Finding That Hifn Was Not Reasonably Relying On
                 Kuyper to Monitor the Maintenance Fees for the '307 Patent After
                 December 2002 Is Arbitrary and Capricious .............................................13

              2. The USPTO's Finding That Irell Did Not Act With Due Care to
                 Monitor the Maintenance Fees for the '307 Patent Prior to December
                 2002 is Arbitrary and Capricious................................................................16

              3. The USPTO's Explanation for its Decision Contradicts the Evidence
                 And Belies Its Decision ............................................................................17

       D. Had the USPTO Considered The Relevant Facts In The Record and Applied The
          Correct Standard It Wound Have Found That The Delay In Payment of The
          Maintenance Fee For The '307 Patent Was Unavoidable .......................................20

IV.    Conclusion .................................................................................................22

# TABLE OF AUTHORITIES

CASES

*California Medical Prod., Inc. v. Tecnol Medical Prod., Inc.,*
   921 F. Supp. 1219 (D. Del. 1995)...............................................................12, 13, 14, 20

*Camp v. Pitts,*
   411 U.S. 138 (1973)...........................................................................................................10

*Ex Parte Pratt,*
   1887 Dec. Comm'r Pat. 31 (Comm'r Pat. 1887) ...........................................................11

*In re Estate of Mendleson,*
   46 Misc. 2d 960 (N.Y. Sur. Ct. 1965)...................................................................18, 19

*In re Mattullath,*
   38 App. D.C. 497 (1912) ...............................................................................................11

*Moon v. United States,*
   512 F. Supp. 140 (D. Nev. 1981).................................................................................18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)............................................................................................................10

*Ray v. Lehman,*
   55 F.3d 606 (Fed. Cir. 1995)...............................................................................11, 13

*Whitman v. W.T. Grant Co.,*
   16 Utah 2d 81 (1964) ...................................................................................................18

STATUTES

5 U.S.C. § 706(2)(A) (2006) ...........................................................................................10

35 U.S.C. § 41(c) ..................................................................................................9, 10, 12

35 U.S.C. § 41(c)(1)....................................................................................................10, 12, 16

37 C.F.R. § 1.362(e)(1)...................................................................................................3

37 C.F.R. § 1.362(e)(2)...................................................................................................3

37 C.F.R. § 1.362(e)(3).....................................................................................................3

37 C.F.R. §1.378(a)....................................................................................................11, 12

37 C.F.R. §1.378(b) .........................................................................................8, 9, 10, 11, 12

37 C.F.R. §1.378(b)(3)............................................................................................9

37 C.F.R. §1.378(e)...................................................................................9, 10, 12


RULES

Fed. R. Civ. P. 56(c) ...............................................................................................10


SECONDARY SOURCES

Restatement (Second) of Torts, § 283 (1978).................................................17, 18

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Hifn submits this opening memorandum in support of its request that the United States Patent and Trademark Office's ("USPTO") decision to refuse reinstatement of the U.S. Patent No. 5,003,307 ("the '307 Patent") be reversed as constituting an arbitrary and capricious agency action by the USPTO.

Hifn does not have in-house counsel nor in-house patent counsel.  Thus, Hifn relied upon the two large, well-respected law firms of Irell & Manella LLP ("Irell") and Latham & Watkins LLP ("Latham") to monitor and maintain its patents.  In 2003, Hifn reasonably expected the third maintenance fee for the '307 Patent to be paid by its counsel, but it was not.  The failure to pay the third maintenance fee finds its origin in an inadvertent clerical error that occurred at Irell when recording the assignments related to Hifn's patents.  The clerical error unleashed a chain of events that resulted in the non-payment of the third maintenance fee for the '307 Patent.

Error occurred in the 2003 time frame as a result of the clerical error.  If it did not, the third maintenance fee would have been paid timely, eliminating the need for Hifn to petition the USPTO for acceptance of the late maintenance fee.  Even so, 35 U.S.C. § 41(c)(1) provides patent owners with an avenue to make delayed maintenance fee payments, even where the delay exceeds 24 months, provided the petitioner – i.e., Hifn – makes a showing of unavoidable delay.

Hifn, through its petitions and the accompanying facts presented to the USPTO, showed that it acted as a reasonable person would through itself and through both counsel, Irell and Latham.  But the USPTO, in sifting through the facts presented to it, essentially ignored the reasonableness of Hifn's actions and of Irell's inadvertent clerical error, and misapplied the relevant case law interpreting 35 U.S.C. § 41(c)(1) by holding Hifn to a higher standard than that of a reasonable person.  Thus, the USPTO's refusal to accept late payment of the third maintenance fee for the '307 Patent was arbitrary and capricious.

PLAINTIFF HIFN, INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 07-66430 MMC

-1-

## II.    STATEMENT OF FACTS

### A.    Brief Summary of the Factual Record

Stac[1], Hifn's predecessor/parent company, was the original owner of the '307 Patent.  In 1991 (the year the '307 Patent issued), Stac was retaining Irell to represent it on a number of matters, including matters related to the '307 Patent.  Bruce Kuyper ("Kuyper"), a registered patent attorney, was the attorney at Irell who had primary responsibility for the prosecution and maintenance of patents owned by Stac (and later also Hifn) at Irell.  Irell docketed and paid the first maintenance fee for the '307 Patent on Stac's behalf in 1994.

In November 1996, Stac spun off a company which was Hifn and assigned the '307 Patent to Hifn.  However, there was a clerical error at Irell when recording the assignment.  In an unforeseen lapse in Irell's procedures, the '307 Patent was not docketed as a Hifn patent and remained docketed as a Stac patent.  The clerical error set in motion a chain of events that resulted in the non-payment of the maintenance fees for the '307 Patent.

Both Stac and Hifn continued to use the services of Irell after the '307 Patent was assigned to Hifn.  Irell docketed and paid the second maintenance fee for the '307 Patent on Hifn's behalf in 1998.

In 2000, Kuyper left Irell and joined Latham.  Hifn, as discussed more fully below, accepted Latham as outside counsel and continued to rely on both Irell and Latham for its legal services, including matters relating to the '307 Patent.  Stac requested the transfer of Stac patent files from Irell to Latham.  Hifn did not request transfer of the '307 Patent file to Latham and the '307 Patent file should have remained with Irell.  But because of the clerical error, the '307 Patent file was incorrectly sent to Latham.

---

[1] The '307 Patent was initially assigned to Stac Electronics, Inc., which later changed its name to Stac, Inc., which later changed its name to Previo, Inc.  Even so, the name changes are irrelevant and the entity will simply be referred to as "Stac" throughout this motion.

1    In 2002, Hifn was aware that the third maintenance fee for the '307 Patent was coming

2    due.  Up to that time, Kuyper, while at Irell, had made timely maintenance fee payments of other

3    Hifn patents.  Hifn expected that Kuyper would also make timely maintenance fee payments for

4    the '307 patent in accordance with past practice.  Thus, in 2002 after consultation with Irell, and

5    believing the '307 patent to be in the capable hands of Kuyper at Latham, Hifn informed Irell

6    that it need not pay the maintenance fee for its patents.  For reasons discussed in detail below,

7    that third maintenance fee was not paid.

8    In December 2006, Hifn first learned of the failure to pay the third maintenance fee

9    through a licensee/customer, Hewlett-Packard ("HP").  As a result, Hifn promptly filed its first

10   petition with the USPTO for reinstatement of the '307 Patent.  After the first petition was denied

11   by the USPTO, Hifn requested a rehearing and filed a petition for reconsideration, which also

12   was denied, leading to the filing of this action.

13   **B.    Details of Factual Record**

14   *1.    Issuance and Maintenance Fee History of the '307 Patent*

15   The '307 Patent issued to Stac on March 26, 1991.  [US00014][2].  On September 12,

16   1994, Irell paid the first maintenance fee for the '307 Patent under 37 C.F.R. § 1.362(e)(1).

17   [US00262].  On September 14, 1998, Irell paid the second maintenance fee for the '307 Patent

18   under 37 C.F.R. § 1.362(e)(2).  *Id.*  The third maintenance fee was due on September 26, 2002.

19   It could have been paid by March 26, 2003 if paid with the surcharge set forth in 37 C.F.R. §

20   1.362(e)(3).  [US00014].  But the third maintenance fee was not paid and the '307 Patent expired

21   after midnight on March 26, 2003.  *Id.*

22   *2.    Facts Leading to the Expiration of the '307 Patent*

23   Hifn does not employ an in-house patent attorney or any other type of in-house counsel.

24   [US00307, ¶1].  Rather, Hifn relies on outside patent counsel to handle all its patent related

25

[2] All citations to the facts used herein refer to the Administrative Record filed by Defendant.

1   matters and outside lawyers to handle all other legal matters.  [US00018, ¶ 3].  Hifn, once

2   formed, retained Irell to manage its patent matters.  [US00329, ¶ 7].  Kuyper, a registered patent

3   attorney, was the Irell attorney responsible for the Stac and Hifn matters from June 1990 through

4   March 2000.  *Id*; [US00018, ¶ 6].

5        Irell has and had a complete system for docketing patent prosecution matters and

6   calendaring deadlines pertaining to proceedings at the USPTO.  [US00018].  Irell used docketing

7   software and docketing services to track maintenance fee due dates for its active patents.  *Id.*;

8   [US00295, ¶ 5].  Irell relied on the software and services to notify the responsible attorneys, such

9   as Kuyper, of maintenance fee due dates.

10       Irell had a practice in place whereby it automatically paid maintenance fees without

11   contacting the client if it had prior authorization from the client.  [US00316, ¶ 4].  This was

12   Kuyper's personal practice at Irell.  *Id.*  Hifn gave Kuyper and Irell authorization to

13   automatically pay maintenance fees on its behalf.  In fact, the second maintenance fee for the

14   '307 Patent was automatically paid in accordance with this practice.  *Id.* at ¶ 11.

15       On November 21, 1996, Stac split its business in two by forming Hifn and assigned

16   twelve of its patents – including the '307 Patent – to Hifn.  [US00018, ¶ 5].  Kuyper undertook

17   efforts to have the assignments recorded at the USPTO shortly thereafter.  *Id.* at ¶ 7.  The

18   assignments of the twelve transferred patents were submitted to the USPTO by Mary L. Cohen

19   ("Cohen"), a Senior Legal Assistant at Irell.  [US00290, ¶ 4].  The assignment for the '307 Patent

20   was recorded with the USPTO on August 29, 1997.  *Id.* at ¶ 5.

21       Under Irell's standard patent docketing procedures, Helena Esparza ("Esparza") – Irell's

22   patent docket clerk at the time – was to be provided copies of all papers sent to or received from

23   the USPTO, including assignment documents.  [US00298, ¶ 10].  Esparza was then responsible

24   for making the appropriate entries into the patent docketing system from the papers provided to

25   her.  *Id.*; [US00019, ¶ 7].

1    Esparza prepared a cover letter dated November 17, 1997 that identified twelve patents

2    that were assigned to Hifn, including the '307 Patent. [US00293]; [US00019, ¶ 8]. Esparza

3    should have made entries to the patent docketing system reflecting the assignments of the patent

4    to Hifn. [US00019, ¶ 8]. But Irell's records reflect that the assignment for only one of the

5    twelve transferred patents was entered into the patent docketing system. [US00331, ¶ 9]. Thus,

6    eleven of the twelve transferred patents erroneously remained listed as assigned to Stac in Irell's

7    patent docketing system – including the '307 Patent. *Id.* This clerical error made in November

8    1997 would later unleash a chain of events that resulted in the non-payment of the third

9    maintenance fee for the '307 Patent.

10    At the end of March 2000, Kuyper left Irell to join Latham. [US00019, ¶ 9]. Even so,

11    his representation of Hifn and Stac did not end. On June 15, 2000, Cliff Flowers ("Flowers"),

12    Stac's Chief Financial Officer, sent an email to Irell requesting that all appropriate files related to

13    Stac be forwarded to Kuyper at Latham. [US00019, ¶ 10]. On June 28, 2000, at the direction of

14    Norman Brunell ("Brunell"), an attorney at Irell, a status report of all active Stac and Hifn patent

15    matters was generated from the patent docketing system. *Id.* On that same day, Irell sent

16    Kuyper the Stac files as identified by the patent docketing system. *Id.*

17    The '307 Patent was erroneously identified as being a Stac patent matter as opposed to a

18    Hifn patent matter as a result of the November 1997 clerical error described above. [US00332, ¶

19    11]. Thus, the '307 Patent file was erroneously sent to Latham even though there were no

20    instructions from Hifn to do so. *Id.* at ¶ 12. Because the '307 patent file was erroneously sent to

21    Latham, the '307 Patent was removed from Irell's patent docketing system (i.e., marked inactive)

22    once transferred. [US00019, ¶ 11]. Consequently, no maintenance fee reminders were generated

23    at Irell for the '307 Patent after June 28, 2000. *Id.*

24    Latham is primarily a general corporate and litigation firm that does not normally handle

25    work related to patent prosecution. [US00319, ¶ 13]. Thus, while Kuyper handled patent

PLAINTIFF HIFN, INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 07-66430 MMC

-5-

1    prosecution-related work at Irell, that was not the kind of work he planned on doing at Latham.

2    *Id.* Latham did not have the type of detailed patent docketing system to track patent prosecution-

3    related work that Kuyper was accustomed to using while at Irell. *Id.* Thus, even though Kuyper

4    retained Hifn as his client at Latham, he believed that the scope of his representation of Hifn at

5    Latham would be limited to advising Hifn on primarily licensing matters. *Id.* Kuyper viewed

6    Irell as retaining responsibility for maintenance fee payments on any of Hifn's issued U.S.

7    patents. *Id.* at ¶ 23. Moreover, neither Kuyper nor Hifn had requested the transfer of '307 Patent

8    file to Latham from Irell. At the time, Kuyper did not believe that Hifn viewed him as the person

9    responsible for payment of maintenance fees. *Id.*; [US00023]. Thus, Kuyper did not track the

10   maintenance fee due dates for the '307 Patent.

11        In about October 2000, Brunell at Irell started to investigate whether certain patents

12   related to data compression technology belonged to Stac or Hifn. [US00019-20, ¶ 13]. Brunell

13   was uncertain as to whether the "data compression" files should have been sent to Latham if they

14   belonged to Hifn. *Id.* Communications were exchanged between Kuyper and Brunell, but they

15   were unable to resolve the confusion. [US00020, ¶ 14-16].

16        In about May 2002, Kuyper was alerted to the fact that the third maintenance fees for two

17   of the eleven Hifn patents for which the files had been erroneously sent to him would soon

18   become due. [US00321, ¶ 18]. Kuyper believed Irell to be responsible for paying the

19   maintenance fees. Kuyper nevertheless notified Hifn of the due dates in an email. *Id.*;

20   [US00020, ¶ 17]. Kuyper noted that Hifn might have previously received a notice from Irell

21   concerning the fees. [US00321, ¶ 18]. Hifn immediately instructed Kuyper to pay the third

22   maintenance fees for these two patents. [US00020, ¶ 17]. Kuyper docketed the due dates in his

23   Outlook calendar and paid the two maintenance fees on May 22, 2002. [US00321, ¶ 20].

24        From Kuyper's perspective, he paid the two maintenance fees for Hifn strictly as a matter

25   of courtesy. [US00321, ¶ 20]. Kuyper believed that Irell was responsible for paying the

1   maintenance fees for the Hifn patents.  On the other hand, Hifn believed that Kuyper was

2   monitoring the maintenance fee due dates for the patent files in his possession.  [US00313, ¶ 6].

3   In fact, in about June 2002, shortly after the two maintenance fees were paid by Kuyper at

4   Latham, Jane Sinclair ("Sinclair"), Controller of Hifn, emailed Kuyper a listing of Hifn's U.S.

5   patents asking him to review the listing to see whether it agreed with his records.  [US00020, ¶

6   18].  The listing included the maintenance fee due date for the '307 Patent.  Unfortunately,

7   Kuyper was traveling and did not respond to Sinclair's email.  *Id*.; [US00322, ¶ 22].

8          Later in 2002, Brunell sought to clarify the situation surrounding the data compression

9   patents with Hifn directly.  On December 23, 2002, Brunell met with Joanne Endow ("Endow"),

10   Hifn's Corporate Finance Director, and Sinclair to discuss the data compression patents.

11   [US00020, ¶ 21].  At the time of the meeting, Hifn was under the impression that both Latham

12   and Irell were monitoring the due dates for payment of maintenance fees for the eleven patents

13   erroneously sent to Kuyper.  [US00312-313, ¶ 6].  Hifn never asked Irell to transfer the files to

14   Kuyper and they would have still been in Irell's possession if not for the November 1997 clerical

15   error.  Also, Kuyper had possession of the files, had paid the maintenance fees for two of the

16   eleven patents, and was sent a listing of other maintenance fees due.

17          Hifn viewed the meeting with Brunell simply as a way to reduce unnecessary duplication

18   of efforts by Irell and Latham.  *Id*.  In view of this understanding, Endow decided at that meeting

19   to maintain the "status quo" so that Kuyper would handle all patent matters for all of the files in

20   his possession and that Irell would handle all patent matters for all of the files in its possession.

21   *Id*.; [US00020, ¶ 21].  Brunell followed Endow's instructions and took no further actions as to

22   Hifn's eleven patents in Kuyper's possession.  [US00020, ¶ 21]; [US00337, ¶ 20].

23          Thus, beginning with the December 23, 2002 meeting, Hifn relied solely on Latham and

24   Kuyper to pay the maintenance fees for the Hifn patents that had been erroneously transferred to

25   him.  But if the files had not been erroneously transferred to Latham, Irell would have

1    automatically paid the maintenance fee pursuant to their practice and Hifn's instructions prior to

2    the meeting.  Unfortunately, Kuyper did not realize that Hifn was relying on him to monitor any

3    maintenance fees for patent files in his possession, including the '307 Patent.  Thus, Kuyper took

4    no action concerning the maintenance fees for the remaining nine patents in his possession.

5    [US00322, ¶ 23].  The '307 Patent expired after midnight on March 26, 2003.

6    **3.**      ***Diligence Following Discovery of the Expiration of the '307 Patent***

7           On November 22, 2006, Hifn received an email from licensee Hewlett Packard indicating

8    that maintenance fees were not paid on several patents and that those patents had expired.

9    [US00282].  That was the first time that Hifn, Irell, or Kuyper were alerted to the fact that the

10   '307 Patent had expired for failure to pay the third maintenance fee.  *Id.*  Hifn immediately

11   retained attorneys to investigate the circumstances leading to the failure to timely pay the

12   maintenance fee.  *Id.*

13   **C.**      **Details of Procedural Record**

14   **1.**      ***Hifn's Petition to Reinstate the '307 Patent Denied By USPTO***

15          On March 13, 2007, Plaintiff filed its Petition To Accept Delayed Payment of

16   Maintenance Fees Under 37 C.F.R. §1.378(b) ("Hifn's Initial Petition").  Hifn's Initial Petition

17   included the requisite maintenance fee, surcharge and a showing that the delay was unavoidable

18   as set forth in 37 C.F.R. §1.378(b).  [US00037].  The declarations of Kuyper, Brunell, Douglas

19   L. Whiting, Ph.D. ("Whiting"), Sinclair, Endow, Jonathan Steinberg ("Steinberg"), Rachelle

20   Wittwer ("Wittwer") and Cohen were submitted to support Hifn's Initial Petition, along with the

21   attached exhibits.  [US00033].  Hifn's Initial Petition sets forth the reasonable actions taken by

22   Hifn and counsel, the facts regarding the unforeseeable error (including, *inter alia*, a docketing

23   error) and argument that the delay in payment was thus unavoidable.

24

25

PLAINTIFF HIFN, INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 07-66430 MMC

-8-

1    The USPTO denied Hifn's Initial Petition on April 25, 2007.  The USPTO decision

2    indicates that the showing of record is inadequate to establish unavoidable delay within the

3    meaning of 37 C.F.R. 1.378(b)(3).  [US00001].

4    **2.    *Hifn's Petition for Reconsideration Denied By USPTO***

5    On June 22, 2007, a Petition for Reconsideration Under 37 C.F.R. § 1.378(e) of

6    Dismissal of Petition to Accept Delayed Payment of Maintenance Fee was filed.  [US00260].

7    Declarations from Cohen, Dee Henderson ("Henderson"), Wittwer, Sinclair, Endow, Kuyper and

8    Brunell were submitted, along with the attached exhibits to support Hifn's Petition for

9    Reconsideration.  *Id.*

10    The Reconsideration Petition sets forth that: (1) a docket clerk at Irell made a clerical

11    error during a routine docketing function she performed as part of her duties, which error

12    unleashed a chain of events a few years later which could not have been foreseen; (2) the

13    declarations submitted in support of the Reconsideration Petition establish that Irell had a

14    reliable docketing system in place at the time of commission of the error; (3) Irell reasonably

15    relied on its employees to manage the docketing system; (4) the conduct of all relevant parties

16    were reasonable based on their understanding at that time; and (5) steps to reinstate the patent

17    were taken promptly upon discovery of non-payment of the third maintenance fee.

18    In a decision mailed October 24, 2007, the USPTO again denied Plaintiff's petition.  The

19    USPTO held that "Petitioner has not met his burden of proving to the satisfaction of the Director

20    that the delay was unavoidable within the meaning of 35 U.S.C. § 41(c)(1) and 37 C.F.R.

21    1.378(b)."  [US00029].  The USPTO found that Hifn failed to docket the maintenance fee due

22    date for the '307 Patent or obligate another for that purpose.  [US00021].  The USPTO also

23    found that the clerical error at Irell did not amount to an unforeseeable, isolated failure in a

24    normally reliable and diligently administered system (and its personnel) that may properly be

25

1   said to be unavoidable under 35 U.S.C. 41(c) and 37 C.F.R. 1.378(b).  [US00025].  Thus, Hifn's

2   petition under 37 CFR 1.378(e) was denied.

3   **III.    ARGUMENT**

4   **A.    The USPTO Decision Must Be Set Aside If It Is Arbitrary or Capricious**

5              An agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or

6   otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2006).  The scope of review under

7   the "arbitrary or capricious" standard is narrow and a court is not to substitute its judgment for

8   that of the agency.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

9   (1983).  An agency decision will be considered arbitrary or capricious if the agency has relied on

10  factors which Congress has not intended it to consider, entirely failed to consider an important

11  aspect of the problem, offered an explanation for its decision that runs counter to the evidence

12  before the agency, or the decision is so implausible that it could not be ascribed to a difference in

13  view or the product of agency expertise.  *Id.*

14             Summary judgment must be granted if the moving party demonstrates "that there is no

15  genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

16  of law."  Fed. R. Civ. P. 56(c).  In reviewing the actions of an agency, the judicial review is

17  based upon the administrative record already in existence.  *Camp v. Pitts*, 411 U.S. 138, 142

18  (1973).  Thus, all facts relevant to the judicial review are present in the administrative record and

19  summary judgment may be granted if the moving party is entitled to judgment as a matter of law.

20  **B.    Patent Law and Precedent Require the USPTO to Accept Late Payment
          Of A Maintenance Fee Where the Delay In Payment Was**
21  **Unavoidable Because Reasonable Steps Were Taken to Pay On Time**

22             U.S. Patent law is not so draconian as to penalize a patent owner for an unavoidable

23  delay.  The law allows a patent owner to petition the USPTO to accept late payment of a

24  maintenance fee and revive an expired patent so long as the delay in paying the maintenance fee

25  was unavoidable.  According to 35 U.S.C. § 41(c)(1), upon petition, the Director of the USPTO

1  may accept the delayed payment provided: (1) the required maintenance fee is paid; (2) a

2  surcharge is paid; and (3) a showing is made that the delay was unavoidable since reasonable

3  care was taken to ensure that the maintenance fee would be timely and that the petition was filed

4  promptly after the patentee was notified of, or otherwise became aware or, the expiration of the

5  patent.  *See* 37 C.F.R. § 1.378(a).  Where the delay was unavoidable, the statute allows the

6  Director to accept payments more than 24 months late.

7      The word "unavoidable" does not require absolute impossibility of avoidance.  As set

8  forth in *In re Mattullath*:

9  > The word unavoidable . . . is applicable to ordinary human affairs, and requires no
10 > more or greater care or diligence than is generally used and observed by prudent
   > and careful men in relation to their most important business.  It permits them, in
   > the exercise of this care, to rely upon the ordinary and trustworthy agencies of
11 > mail and telegraph, worthy and reliable employees, and such other means and
   > instrumentalities as are usually employed in such important business.  If
12 > unexpectedly, or through the unforeseen fault or imperfection of these agencies
   > and instrumentalities, there occurs a failure, it may properly be said to be
13 > unavoidable, all the other conditions of good faith and promptness in its
   > ratification being present.

14 38 App. D.C. 497, 514-15 (1912) (quoting *Ex Parte Pratt*, 1887 Dec. Comm'r Pat. 31, 32-33

15 (Comm'r Pat. 1887)).  Thus, "in determining whether a delay in paying a maintenance fee was

16 unavoidable, one looks to whether the party responsible for payment of the maintenance fee

17 exercised the due care of a reasonably prudent person."  *Ray v. Lehman*, 55 F.3d 606, 609 (Fed.

18 Cir. 1995).

19     The showing of unavoidable delay must enumerate: (1) the steps taken to ensure timely

20 payment of the maintenance fee, (2) the date and manner in which patentee became aware of the

21 expiration of the patent, and (3) the steps taken to file the petition promptly.  37 C.F.R. §

22 1.378(b).  According to the statute, USPTO Rules, and case law, the petitioner may show that the

23 delay was unavoidable by showing that reasonable steps were taken to ensure timely payment

24 of the maintenance fee and that the petitioner acted promptly upon learning of the expiration of the

25 patent.  The owner of a patent may show that it took reasonable steps to ensure timely payment

by showing that it engaged outside counsel to pay the maintenance fees due for its patents.

*California Medical Prod., Inc. v. Tecnol Medical Prod., Inc.*, 921 F. Supp. 1219, 1259 (D. Del. 1995).  If delay occurs in the payment of the maintenance fees, the reliance upon outside counsel does not provide the patent owner with an absolute defense to justify the delayed payment, but rather shifts the focus of the inquiry to whether outside counsel acted reasonably and prudently. *Id.*  The patent owner must therefore show that the actions of its counsel were also reasonable and prudent.  *Id.*

The record shows that Hifn took reasonable steps to ensure timely payment of the maintenance fees for the '307 Patent.  Hifn did not have in-house counsel to monitor and maintain its patent portfolio.  The record shows that Hifn engaged outside counsel to pay the maintenance fees for its patents.  Hifn engaged two large and well-respected law firms, Irell and Latham, to monitor and maintain its patent portfolio.  The record shows that both firms acted with due care and reasonable prudence within what they considered the scope of their engagement.  However, an unforeseen clerical error led to a chain of events that resulted in the expiration of the '307 Patent despite the exercise of due care by all concerned.  The record therefore makes the requisite showing that Hifn took reasonable steps to ensure timely payment of the maintenance fees and that the delay was thus unavoidable as defined by 35 U.S.C. § 41(c)(1), 37 C.F.R. § 1.378(a) and the relevant case law described above.

**C.    The USPTO Finding That Hifn Did Not Take Reasonable Steps to Ensure Timely Payment of the '307 Patent Maintenance Fees is Arbitrary and Capricious**

Despite the evidence in the record to the contrary, the USPTO found that Hifn failed to docket the maintenance fee due date for the '307 Patent or obligate another for that purpose. [US00021].  The USPTO also found that the clerical error at Irell did not amount to an unforeseeable, isolated failure in a normally reliable and diligently administered system (and its personnel) that may properly be said to be unavoidable under 35 U.S.C. 41(c) and 37 C.F.R. 1.378(b).  [US00025].  Thus, Hifn's petition under 37 CFR 1.378(e) was denied.  The USPTO

1   made several errors when reaching its decision.  First, the USPTO was wrong when it found that

2   Hifn had not engaged counsel to docket and pay the maintenance fees for the '307 Patent.

3   Second, the USPTO was wrong when it found that the clerical error at Irell was not an

4   unforeseeable, isolated failure in a normally reliable and diligently administered system.  Third,

5   the USPTO's explanation for its decision contradicts the record and belies its decision.

6   **1.     The USPTO's Finding that Hifn was not Reasonable Relying on Kuyper to Pay the**
        **Maintenance Fees for the '307 Patent after December 2002 is Arbitrary and**
7       **Capricious.**

8              Every determination as to whether a delay in payment was unavoidable must take into

9   consideration the reasonableness of a person's conduct.  Moreover, the determination as to the

10  reasonableness of a person's conduct must be made by taking all the facts and circumstances into

11  account.  *See Ray*, 55 F.3d at 609.  In its decision, the USPTO found that Hifn's reliance on

12  Kuyper after December 2002 was unreasonable without an express arrangement between Hifn

13  and Kuyper (while at Latham) to monitor the '307 Patent maintenance fees.  [US00021].  In fact,

14  given the lack of an express agreement between Hifn and Kuyper, the USPTO characterizes

15  Hifn's reliance on Kuyper as amounting to nothing more than "blind faith."  *Id.*  However, the

16  USPTO limited its analysis to the fact that there was no express arrangement between Hifn and

17  Kuyper regarding the payment of maintenance fees once Kuyper began working at Latham.  This

18  was improper because a patent owner can reasonably rely on an attorney to monitor maintenance

19  fees on its behalf even in the absence of an express agreement to do so if the facts and

20  circumstances justify the reasonableness of the patent owner's reliance.

21             For example, in *Tecnol*, 921 F. Supp. 1219 (D. Del. 1995), the court held that a patent

22  owner can reasonably rely on an attorney to monitor the maintenance fees for a patent in the

23  absence of an express arrangement to do so.  In that case, the patent owner declared that he relied

24  upon his attorney to remind him of all maintenance fee deadlines despite the fact that no specific

25  arrangement existed between the patent owner and the attorney regarding maintenance fees.  *Id.*

PLAINTIFF HIFN, INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 07-66430 MMC

-13-

1   at 1258.  Acknowledging the fact that legally unsophisticated patent holders counted on him to

2   remind them of maintenance fee deadlines, the attorney who prosecuted the patent maintained a

3   docket on an office personal computer in order to track maintenance fees.  *Id.*  As fate would

4   have it, a docketing error occurred at the attorney's office.  *Id.*  Consequently, no reminder was

5   sent to the patent owner as to the maintenance fee due date.  *Id.*  In the absence of a reminder

6   from his attorney, the patent owner unwittingly allowed the patent to lapse.  *Id.*  It took

7   approximately two and a half years for the failure to pay the maintenance fee to be discovered by

8   the attorney.  *Id.*  Once the error was discovered, a petition to reinstate the patent was filed with

9   the USPTO.  *Id.*  The USPTO granted the petition. *Id.*

10          A third party later challenged the USPTO's decision to reinstate the patent.  The Court in

11   *Tecnol* held that the USPTO properly reinstated the patent.  *Id.* at 1260.  Specifically, the court

12   held that a patentee may rely upon counsel to monitor maintenance fee due dates.  *Id.* at 1259.

13   The court also found that the patent owner did not "do nothing" to ensure that the maintenance

14   fee was paid for the '219 Patent.  Rather, "[h]e had previously retained [an attorney] to provide

15   general representation in connection with the '619 and '219 patents."  *Id.*  Thus, even though

16   there was no specific arrangement between the attorney and the patent owner regarding

17   maintenance fees, the court found that the patent owner "acted as a reasonably prudent person in

18   concluding that this would fall within the scope of representation provided by [his attorney], and

19   that [his attorney] would inform him when the maintenance fee payment was due."  *Id.*  The

20   patent owner's reliance upon his attorney was therefore sufficient to shift the focus of the Court's

21   inquiry to whether his attorney acted reasonably and prudently.  *Id.*

22          The USPTO therefore applied the wrong standard when it found Hifn's reliance on

23   Kuyper after December 2002 unreasonable without an express arrangement.  The USPTO failed

24   to consider the following important facts and circumstances which show that Hifn was

25

1  reasonable in relying on Kuyper to monitor and maintains its patents despite the lack of an

2  express agreement.

3      Hifn retained two large and highly respected law firms to prosecute, monitor and license

4  the '307 Patent at all times relevant herein.  Kuyper was responsible for monitoring and paying

5  the maintenance fees for all of Hifn's patents, including the '307 Patent first at Irell then at

6  Latham.  Kuyper's personal practice at Irell was to automatically pay Hifn's maintenance fees

7  without notifying Hifn or seeking its approval.  For example, the second maintenance fee for the

8  '307 Patent was paid in this manner by Kuyper.  There is nothing in the record that indicates that

9  this authorization was ever expressly or implicitly revoked by Kuyper or Hifn.  When Kuyper

10  left Irell in March of 2000, he retained Hifn as a client.  Not only did Kuyper retain Hifn as a

11  client, but he had actual possession of the '307 Patent file.

12      Kuyper – while at Latham – did more than just licensing work for Hifn.  Of the eleven

13  Hifn patents erroneously sent to Kuyper on June 28, 2000, Kuyper actually paid the first two

14  maintenance fees which became due within that group of patents.  From Hifn's point of view, the

15  scope of Kuyper's representation extended to non-licensing matters – as evidenced by his prior

16  conduct – regardless of the fact that he was now at Latham.  Consistent with Hifn's point of

17  view, following Kuyper's payment of the first two maintenance fees, Sinclair of Hifn sent

18  Kuyper an email which included a list of other maintenance fees which needed to be paid in

19  order to verify that the list agreed with Kuyper's records.  The list included the '307 Patent.

20  Even though Kuyper did not to respond to this email, the email shows that Hifn viewed Kuyper

21  to be the attorney responsible for monitoring and paying the third maintenance fee for the '307

22  Patent.  Hifn's actions were consistent with that of a reasonably prudent person.

23      Overall, Hifn's reasonable dependence on outside counsel to manage its patent portfolio,

24  its prior history with Kuyper at Irell, Kuyper's possession of the patent files at Latham and the

25  fact that Kuyper was paying Hifn's maintenance fees while at Latham – just as he had always

PLAINTIFF HIFN, INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 07-6430 MMC

-15-

1    done – are all essential facts that should have been considered by the USPTO.  But instead, the

2    USPTO relied upon the lack of an express arrangement between Hifn and Kuyper (while at

3    Latham) to conclude that Hifn was not reasonably relying on any counsel to monitor the '307

4    Patent after December 2002.  The USPTO's decision failed to consider important aspects of the

5    problem and was therefore arbitrary and capricious.

6    **2.     *The USPTO's Finding that Irell Did Not Act with Due Care to Monitor the***
             ***Maintenance Fees for the '307 Patent is Arbitrary and Capricious***
7

8           Irell was responsible for maintaining the Hifn' patents and paying the maintenance fees

     and had express instructions to pay the maintenance fees until relieved of that obligation in
9
     December 2002.  Even the USPTO found that Irell was tracking the maintenance fees for all of
10
     Hifn's patents until relieved of that obligation in December 2002.  [US00024].  However, had it
11
     not been for the November 1997 clerical error, Irell would have paid the third maintenance fee
12
     for the '307 patent in September 2002 in accordance with its procedures and Hifn's instructions.
13
            The USPTO found that Irell did not act with due care to monitor the '307 Patent
14
     maintenance fees.  Specifically, the USPTO found that the evidence provided by Hifn did not
15
     establish the fact that Irell's employees were sufficiently trained and experienced since: (1)
16
     Irell's clerical procedures for recordation of patent assignments were not followed for 11 of the
17
     12 Hifn patents amounting to a clerical error rate of 92% (and as far as this patent is concerned, a
18
     clerical error rate of 100%); (2) Cohen has insufficient training in patent matters; and (3)
19
     Esparza's training and experience was not adequately established.
20
            First, under the logic employed by the USPTO, no clerical errors would ever be excused
21
     since the clerical error rate for any patent at issue under 35 U.S.C. § 41(c)(1) would always be
22
     100%.  The error rate of 92% calculated by the USPTO has no relationship as to whether Irell's
23
     employees were sufficiently trained or experienced.  It ignores the many thousands of properly
24
     made docketing entries made by those employees.  The USPTO's offered explanation here runs
25

1   counter to the evidence and common sense and has no bearing on whether Irell acted with due

2   care.

3        Second, Cohen's training in patent matters is irrelevant as to whether Irell acted with due

4   care.  Cohen was responsible for filing the assignments with the USPTO.  The record shows that

5   Cohen successfully accomplished that task.  Accordingly, Cohen's involvement in this matter is

6   completely irrelevant since no error was committed by Cohen.

7        Third, Esparza's training and experience was adequately established.  Brunell – a

8   registered patent attorney and a partner at Irell – and Henderson – the senior paralegal at Irell

9   responsible for managing the docketing system at Irell for almost a decade – both submitted

10  declarations stating that Esparza was adequately trained to perform her job duties.  The record

11  before the USPTO establishes that Henderson personally trained and supervised all patent docket

12  clerks at Irell including Esparza.  [US00296, ¶ 10].  Esparza was trained to review and enter

13  information into the docket system pertaining to assignments.  [US00299, ¶ 11].  Henderson

14  considered Esparza to be competent and not prone to making mistakes.  [US00298, ¶ 10].

15  Brunell also indicated that Esparza was considered a reliable employee and that her departure

16  from Irell was entirely voluntary and had nothing to do with her job performance.  [US00331, ¶

17  9].  These facts are sufficient to show that Esparza was sufficiently trained.

18       Overall, the docketing error provides an adequate basis to show that the delay was

19  unavoidable and the USPTO's conclusions to the contrary are arbitrary and capricious since they

20  run counter to the evidence before the agency.  The USPTO's determination that the docketing

21  error was not the cause of the delay at issue runs counter to the evidence before the agency.

22  **3.    *The USPTO Explanation for Its Decision Applied the Wrong Standard by Failing to
        Allow Hifn to Reasonably Rely on Counsel to Monitor and Pay its Patent Maintenance
23      Fees.***

24       Even assuming, *arguendo*, that the USPTO properly considered all of the important

25  aspects of the problem, the USPTO's explanation for its decision still runs counter to the

1   evidence before the agency.  The USPTO held Hifn to a higher standard than that of a reasonable

2   person.  A reasonably prudent person is a person of ordinary attention, knowledge, intelligence

3   and judgment.  *See* Restatement (Second) of Torts, § 283 (1978).  The fact that this judgment is

4   personified in a "man" calls attention to the necessity of taking into account the fallibility of

5   human beings."  *Id.*  "[A]n 'ordinary man' is not necessarily a supercautious individual devoid of

6   human frailties and constantly preoccupied with the idea that danger may be lurking in every

7   direction about him at any time. . . . [and] to require such constant apprehension of danger from

8   every possible source would indeed be beyond normal conduct and would be too exacting a

9   standard."  *Whitman v. W.T. Grant Co.*, 16 Utah 2d 81, 83 (1964).  In determining whether a

10  person exercised the due care of a reasonably prudent person, it is rather easy to have 20/20

11  hindsight and say that something different should have been done.  *Moon v. United States*, 512 F.

12  Supp. 140, 149 (D. Nev. 1981).  Thus, a court must view conditions as they existed at the time to

13  try and see whether there was such want of attention to the nature or the probable consequence of

14  any act or omission, as a reasonably prudent person ordinarily bestows in acting in his or her

15  concerns of like importance.  *Id.*  As one court put it: "Even the hopeless idiot has the matchless

16  intelligence of the seer when he views the effect of an impending catastrophe after the same has

17  happened."  *In re Estate of Mendleson*, 46 Misc. 2d 960, 966 (N.Y. Sur. Ct. 1965).

18        In denying Hifn's petition, the USPTO concluded that Hifn's conduct was not the manner

19  in which prudent and careful persons conduct their most important business because: (1) Kuyper,

20  while at Latham, had no means of tracking and paying future maintenance fees and was unaware

21  that Hifn was relying on him to track and pay the fee; (2) Brunell at Irell was specifically

22  instructed by Endow of Hifn to take no further action on behalf of Hifn as to the '307 Patent; and

23  (3) Hifn, upon instructing Brunell to take no further action as to the '307 Patent, never thereafter

24  expressly obligated Kuyper to track the fee, and did not then undertake to track the fee on its

25  owns.  These conclusions run contrary to the evidence.  Specifically, the evidence shows that

1    Hifn acted as a reasonably prudent person in concluding that monitoring of maintenance fees for

2    the '307 Patent would fall within the scope of representation provided by Kuyper after December

3    2002.

4         First, the fact that Latham did not have a patent docketing system only became apparent

5    to Hifn during its investigations in support of its petition to reinstate.  Had Hifn known this fact

6    in 2003, it would have relied on other counsel to track and pay the '307 Patent maintenance fees.

7    Thus, this conclusion is based on impermissible hindsight.  Moreover, Hifn had no reason to

8    doubt Kuyper's ability to track maintenance fee deadlines.  As far as Hifn was concerned,

9    Kuyper was a registered patent attorney capable of handling all of Hifn's patent needs who

10   happened to move from one large, well respected law firm to another larger, well respected law

11   firm.  Still further, at the time the '307 Patent expired, Kuyper already paid the maintenance fees

12   for two of Hifn's patents while he was at Latham.  Given Kuyper's *demonstrated* ability to track

13   and pay maintenance fees while at Latham, Hifn reasonably concluded that he could and would

14   take on that responsibility even after changing firms.

15        Second, Hifn's instruction to Brunell in December 2002 further demonstrates the fact that

16   Hifn was reasonably relying on Kuyper to pay the '307 Patent maintenance fees after December

17   2002.  Otherwise, Hifn would have instructed Brunell to pay the maintenance fees.

18        Finally, the absence of an express arrangement between Kuyper and Hifn is not fatal to

19   Hifn's contention that it was reasonably relying on Kuyper as explained above.  *See e.g.*, *Tencol*,

20   921 F. Supp. at 1259 (finding that the patent owner acted as a reasonably prudent person in

21   concluding that payment of maintenance fees would fall within the scope of representation

22   provided by his attorney even in the absence of a specific arrangement).  To require an express

23   arrangement would hold Hifn to a higher standard than that of a reasonable person.

24        The following facts sufficiently justify Hifn's reliance on Kuyper: (1) Kuyper was relied

25   upon by Hifn to pay the maintenance fees for the '307 Patent from the moment it issued; (2)

PLAINTIFF HIFN, INC.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 07-66430 MMC

-19-

1   Kuyper had an arrangement with Hifn while at Irell that he would pay the maintenance fee on

2   Hifn's behalf automatically without first notifying Hifn; (3) the second maintenance fee for the

3   '307 Patent was paid automatically by Kuyper; (4) there is nothing in the record which indicates

4   that this authorization was ever revoked by Kuyper or Hifn; (5) even when Kuyper left Irell for

5   Latham, he retained Hifn as a client; (6) at Latham, Kuyper performed licensing work related to

6   the '307 Patent; (7) Kuyper had actual possession of the '307 Patent file at the time the third

7   maintenance fee was due; (8) Kuyper paid the maintenance fee for two other patents owned by

8   Hifn while at Latham, demonstrating his ability to do so from Hifn's perspective; and (9) Hifn

9   subsequently sent Kuyper an email with the remaining due dates for the patent files in his

10  possession which included the '307 Patent.

11         In light of the totality of facts and circumstances present in this case including the nature

12  and history of the relationship between Hifn and Kuyper, the USPTO's conclusion that Hifn did

13  not act as a reasonably prudent person in concluding that monitoring and payment of

14  maintenance fees for the '307 would fall within the scope of representation provided by its

15  counsel when the '307 Patent expired is contrary to the evidence.  For all the reasons set forth

16  above, Hifn was reasonably relying on its counsel to pay the maintenance fees for the '307

17  Patent.  Consequently, under *Tecnol*, the focus of the inquiry should have shifted to Hifn's

18  counsel to determine whether its counsel's actions were reasonable and prudent.  Nevertheless,

19  the focus of the USPTO's inquiry was centered around Hifn's own efforts to monitor and pay the

20  maintenance fees for the '307 Patent.  Thus, the USPTO's failure to properly shift the focus of

21  the inquiry amounts to an arbitrary and capricious agency action.

22  **D.    Had the USPTO Considered the Relevant Facts In the Record and Applied the
         Correct Standard It Would Have Found That the Delay In Payment of the
23       Maintenance Fee For the '307 Patent Was Unavoidable**

24         The record shows that Hifn engaged and reasonably relied upon Irell and Kuyper to

25  monitor and maintain its patents.  Hifn does not have in-house counsel or in-house patent

1   counsel.  The USPTO agreed that Hifn engaged Irell to monitor and pay maintenance fees for its

2   patents.  [US00018, ¶ 3].  Kuyper was the attorney at Irell responsible for Hifn's patent work.

3   Id. at ¶ 6.  Hifn instructed Kuyper and Irell to automatically pay the patent maintenance fees for

4   Hifn's patents including the maintenance fees for the '307 Patent.  The second maintenance fee

5   for the '307 patent was paid by Irell in accordance with Hifn's instructions.

6          The record clearly shows that Irell had an adequate business routine for performing the

7   clerical function that could reasonably be relied upon to avoid errors in its performance.  Brunell

8   – a registered patent attorney and a partner at Irell – and Henderson – the senior paralegal at Irell

9   responsible for managing the docketing system at Irell for almost a decade – both submitted

10  declarations stating that the docketing system used at Irell was accurate and reliable in their

11  experience.  The record clearly shows that Irell's employees were sufficiently trained and

12  experienced.  Henderson's declaration indicates that she trained and supervised all patent docket

13  clerks at Irell including Esparza.  [US00296, ¶ 6].

14         It was not until December 2002, that Hifn instructed Irell to stop handling the Hifn

15  matters that had been transferred to Latham.  [US00020, ¶21]. Consistent with Irell's handling of

16  the first and second maintenance fees for the '307 Patent, the third maintenance fee would have

17  automatically been paid by Irell in September 2002.[3]

18         Hifn believed that it had engaged Latham to handle the patent matters previously handled

19  by Irell – including payment of maintenance fees.  Although not addressed by the USPTO

20  decision, the record shows that Kuyper acted reasonably based on his understanding of the scope

21  of his engagement.  When Kuyper left Irell to Latham, he retained Hifn as a client.  However, he

22  viewed the scope of his employment as being limited to primarily licensing matters related to

23  Hifn's patents.  His understanding of the scope of his representation for Hifn was reasonable

24

25  _____

[3] The first maintenance fee was due on September 26, 1994.  Irell paid this maintenance fee on September 12, 1994.  The second maintenance fee was due on September 26, 1998.  Irell paid this maintenance fee on September 14, 1998.

given the fact that Latham does not normally handle work related to patent prosecution.  While he did receive the Hifn's patent files, including the '307 Patent file, he reasonably assumed that it was only in connection with his licensing work.  Moreover, his understanding of the situation was consistent with sequence of events which would have occurred in the absence of the docketing error. If Kuyper had known that he was being relied upon at Latham, he would have paid the maintenance fees for Hifn's patents, including the '307 Patent.

Hifn reasonably believed that it had engaged Kuyper at Latham to handle matters related to the '307 patent.  Hifn engaged Latham for patent matters.  Kuyper was the same attorney Hifn used at Irell for prosecution matters – including payment of the '307 Patent maintenance fees. Irell sent Kuyper the prosecution files for further handling.  Kuyper paid maintenance fees for two of Hifn's patents at Latham.  Consistent with its reasonable belief, Hifn sent Kuyper a list of the patent files and maintenance fees including the '307 patent.  Hifn had no knowledge of Kuyper's belief that his representation was limited to licensing matters.

Had the USPTO considered these relevant facts in the record and applied the correct standard it wound have found that the delay in payment of the maintenance fee for the '307 patent was unavoidable.

## IV.   CONCLUSION

The facts and circumstances of this case present a compelling case that the USPTO's decision to deny reinstatement of the '307 Patent was arbitrary and capricious.  As there are no genuine issues of material fact, the Court may properly grant summary judgment in Plaintiff's favor and order the USPTO to reinstate Hifn's patents at issue.

Respectfully submitted,

Dated: ____April 25, 2008_____     ____/s/ Martin C. Fliesler_____
                                      FLIESLER MEYER LLP
                                      Martin Fliesler (SBN 073768 )
                                      Rex Hwang (SBN 221079)
                                      Julie Daniels Missud (SBN 219508)

1   650 California Street, 14th Floor
    San Francisco, California 94108

2
    Attorneys for Plaintiff
3   Hi/fn, Inc.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25